UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-cr-16-TRM-SKL |
| | ) | |
| SHAUN EARL GIBSON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Shaun Earl Gibson ("Defendant") [Doc. 13]. Defendant is indicted on a single charge of being a felon in possession of a firearm on March 24, 2016, the day of the warrantless search at issue [Doc. 1]. In summary, claiming that his Fourth Amendment rights were violated, Defendant seeks to suppress evidence[1] seized during the warrantless search and to suppress his post-search confession under a fruit-of-the-poisonous-tree theory. Plaintiff United States of America ("the government") filed a response in opposition to the motion arguing that Defendant did not have a reasonable expectation of privacy in the place and items searched and, even if he did, the person who gave consent for the search had actual or apparent authority to do so [Doc. 15]. Finding no reasonable expectation of privacy in the place and items searched, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

---

[1] The parties often refer to "the gun" in their respective briefs, but presumably are addressing both guns and the magazines found during the search. The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) by standing order. Both parties submitted a post-hearing brief [Docs. 25 & 26] and an agreed transcript of the audio recording introduced at the hearing [Doc. 27]. Defendant submitted a post-hearing reply as well [Doc. 28].

I.      FACTUAL BACKGROUND

During the evidentiary hearing held on February 14, 2017, the government offered the testimony of the only two witnesses: Shelbyville Police Department patrol officers John Cooke ("Cooke")[2] and Jeffrey L. Goodrich ("Goodrich"). Defendant offered no witnesses. A police recording (Exhibit 4), a copy of Defendant's Probation Order setting his conditions of state parole (Exhibit 5), and various photographs (Exhibits 1, 2 & 3) were entered as exhibits by the government. With respect to the recording, portions of it, though often difficult to hear, were played during the hearing. Subsequently, counsel jointly agreed on a transcript of the communications audibly recorded (Exhibit 6) as part of their post-trial submissions [Doc. 27].

The facts are largely undisputed. As reflected on the recorded encounter on the day at issue and in the officers' testimony, Cooke responded to a 911 hang-up call from a home occupied by Defendant's ex-girlfriend, Stephanie Cuff ("Cuff"), on March 24, 2016. Based on his observations of Cuff, Cooke determined the call was not an accidental call to 911. Cooke decided to investigate domestic violence and called for back-up.

When Cooke first arrived, Defendant was inside the house. Cooke thought Cuff was scared, and he concluded that she did not want Defendant to hear her talking to Cooke. At some point early on in the interaction, Cuff indicated Defendant had grabbed her arm and Cooke could see the hand print on her arm still.

Before backup arrived, Defendant came outside and asked why Cooke was there. Cooke told Defendant he had received a report of violence from the house. Cooke had a hunch or uneasy feeling that Defendant might be armed. Although Cooke knew of Defendant from prior encounters, he asked Defendant to produce identification to separate him from Cuff. Defendant

---

[2] Misspelled as "Cook" in various filings.

went into Cuff's bedroom to obtain his identification. Defendant remained in the bedroom until back-up officers arrived. Officers Peacock ("Peacock") and Goodrich ("Goodrich") were the backup officers. Peacock and Goodrich stayed with Defendant in the living room at the front of the house while Cooke talked to Cuff on the front porch again. Goodrich and Cooke both knew Defendant from prior law enforcement encounters with him.

Cooke knew Cuff was pregnant. He also knew Cuff had been involved in domestic violence with Defendant a few months earlier. Although Cooke testified he was not certain of what Cuff said about how long Defendant had been at Cuff's home, he also testified Cuff said her ex-boyfriend (Defendant) had been at her house a few days or a little while. Because Cooke observed finger-sized bruises or marks on Cuff's arm, Cooke decided to arrest Defendant for domestic violence assault. As a result, Defendant was told that he was being arrested.

After Defendant was arrested and taken to the jail, Cooke asked Cuff if he could search. Cuff at first indicated she did not want the officers to search, but then gave permission and even said she knew what the officers were looking for. When asked what that was, she responded, "a gun." She stated that Defendant had not been with her and had "been gone" for about two months, but that she had heard that someone had been shot with the gun. She said she wanted the gun out of the house. It is undisputed that Cuff gave the officers permission to search her house and bedroom for a gun and did not attempt to limit the search in any way at any time.

Cooke knew Defendant did not live at the house. Defendant had a trash bag of clothes in the front living room. Other than the trash bag, Cooke saw no men's clothes or toiletries anywhere in the house. Cooke could not recall if Defendant took the trash bag of clothes with him when he was arrested.

The officers focused their firearm search on Cuff's bedroom, because Defendant had

3

stayed there for what Cooke thought was an extended period of time after Cooke asked for identification. The officers found an unlocked, white metal utilities container with holes for cables like a breaker box ("metal box") under a dresser in Cuff's bedroom. It is undisputed the metal box was unlocked, but closed and nothing inside was visible without opening the metal box. The dresser had to be lifted in order to remove the metal box. Cuff said the metal box was not hers; it was "his" (i.e., Defendant's). The metal box was opened and found to contain a purple Crown Royal bag. Upon picking up the bag, the officers could feel the guns. The bag was opened, and it contained two handguns and magazines.

Sometime during the process of booking Defendant, the officers learned Defendant was on state probation. It is undisputed that the officers did not know Defendant was on probation at the time of the search. During the hearing, Cooke had still not seen the conditions set in Defendant's Probation Order. During the hearing, he assumed, based on his experience and training, that Defendant had agreed to a warrantless search by any law enforcement officer as a standard condition of probation.

At the conclusion of the hearing, Defendant's Probation Order was entered as Exhibit 5. In it, Defendant contracted for a waiver of any search warrant requirement as a condition of his probation. Specifically, it states: "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement officer, at any time." [Exhibit 5 at ¶7]. Defendant initialed the warrant waiver and signed the Probation Order immediately below a statement indicating that he had read and understood his probation conditions and would abide by them.

Even though Cuff had been subpoenaed to the hearing and was present, neither party called her as a witness.

## II.     ANALYSIS

It is undisputed that during the consensual search of Cuff's home, officers found the closed but unlocked metal box hidden under the dresser in Cuff's bedroom. Defendant does not contest that Cuff gave valid consent to search her home; rather, he argues his rights were violated when the officers opened the metal box and bag knowing that the metal box belonged to him—not Cuff. Defendant argues that he had an expectation of privacy in the metal box as an overnight guest at Cuff's home and that the search of the metal box was unconstitutional because Cuff did not have the authority, either actual or apparent, to consent to a search of it. Further, Defendant argues that the police should not be allowed to engage in a post-hoc justification of the search based on the warrant waiver condition of his probation because his status as a probationer was not known to the officers at the time of the search. Defendant argues that all evidence obtained both during and after the search, including his alleged confession about a week after the search, should be suppressed as a result.

The government counters that Defendant did not have a reasonable expectation of privacy in the place and items searched because he was trespassing in Cuff's home and voluntarily abandoned the metal box there. In addition, the government contends that if Defendant had a reasonable expectation of privacy in the metal box, Cuff had both actual and apparent authority to consent to a search of the home and metal box and did so. During the hearing, the government added the argument that Defendant waived any expectation of privacy when he agreed to warrantless searches as a condition of his state probation. In a post-hearing submission, the government also argued inevitable discovery based on the probation order.

### A. Fourth Amendment

The foundation of Defendant's argument is the Fourth Amendment to the United States Constitution, which provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Emphasizing that Fourth Amendment rights are "personal," *Rakas v. Illinois,* 439 U.S. 128, 140 (1978), the Sixth Circuit Court of Appeals ("Sixth Circuit") has stated that "the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Waller,* 426 F.3d 838, 843-44 (6th Cir. 2005); *accord United States v. King,* 227 F.3d 732, 743 (6th Cir. 2000) (citing *Katz v. United States,* 389 U.S. 347, 353 (1967)).

"A person may acquire a reasonable expectation of privacy in property in which he has neither ownership nor any other legal interest." *United States v. Washington*, 573 F.3d 279, 283 n.1 (6th Cir. 2009) (citing *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (holding that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable")). The place to be searched "need not be [the defendant's] 'home,' temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there. '[T]he Fourth Amendment protects people, not places,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Olson*, 495 U.S. at 96, n.5 (holding that a defendant who was a houseguest at the residence of two friends had a legitimate expectation of privacy in his own room) (quoting *Katz*, 389 U.S. at 351). Overnight guests have expectations of privacy in their personal items in another's property. *Minnesota v. Carter*, 525 U.S. 83, 88-89 (1998).

A defendant bears the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). In order to determine whether a legitimate expectation of privacy exists, courts employ a two-part test: "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *King,* 227 F.3d at 743-44 (quoting *Bond v. United States,* 729 U.S. 334, 338 (2000)). The typical "factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched." *United States v. McRae,* 156 F.3d 708, 711 (6th Cir. 1998) (holding that a defendant who had been living in a vacant house for approximately one week had failed to demonstrate that he had a legitimate expectation of privacy).

The basic tenant of Fourth Amendment jurisprudence—that a warrantless and suspicionless search by the police is unconstitutional—has relatively few exceptions. However, assuming a legitimate expectation of privacy exists, a warrantless search does not violate the Fourth Amendment if an applicable exception, such as consent, exists. *See Schneckloth v. Bustamonte*, 412, U.S. 218, 219 (1973). With respect to consent, "permission to conduct a warrantless search may be given not only by the owner of the property, but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects to be inspected.'" *United States v. Attar*, No. 89-5659, 1990 WL 102876, at *2 (6th Cir. July 24, 1990) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). A third party's ability to consent "derives not from any property interest the third party may have in the property, 'but rests rather on mutual use of the property by persons having joint access or control for most purposes . . . .'" *Id.* (quoting *Matlock*, 415 U.S. at 172 n.7). "It is the Government's burden

by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010) (internal quotation marks omitted).

One additional exception to the warrant requirement of the Fourth Amendment is at issue in this case; that is, Defendant's waiver of the Fourth Amendment warrant requirement as a condition of probation. As the Sixth Circuit recently explained,

> A probationer's [or parolee's] home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). However, probationers, like parolees, "do not enjoy the 'absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" *Id.* at 874, 107 S.Ct. 3164 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In fact, "the Supreme Court has made clear that the nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment." *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007).
>
> The Supreme Court has identified two justifications under which a parole-authorized warrantless search may be found reasonable under the Fourth Amendment. First, the Court in *Griffin* recognized that a state's operation of a probation system "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin*, 483 U.S. at 873-74, 107 S.Ct. 3164. The Court upheld the search of a probationer's home pursuant to a state regulation that authorized a warrantless search when a probation officer had "reasonable grounds" to believe the probationer was in possession of contraband. *Id.* at 870-71, 107 S.Ct. 3164. Then, in *Knights*, the Court recognized that a police officer's search of a probationer's home pursuant to a probation condition authorizing the search with or without a warrant or probable cause could be reasonable under the "totality of the circumstances." *United States v. Knights*, 534 U.S. 112, 118-19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). If a warrantless search is reasonable under either *Knights* or *Griffin*, it need not pass muster under the other. *Herndon*, 501 F.3d at 688.

*United States v. Payne*, 588 F. App'x 427, 431 (6th Cir. 2014) (alteration in original) (footnote about the Court's extension of *Knights* to parolees omitted).

In *Knights*, defendant was placed on probation and subject to a probation order which required that he submit to search at any time, with or without a search warrant or reasonable cause, by any probation or law enforcement officer. *Knights*, 534 U.S. at 112. He signed the probation order immediately below a statement indicating he had read and understood his probation conditions and would abide by them. *Id.* Relying heavily on *Knights*, the Supreme Court in *Samson v. California* held that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee when the parolee agrees to be subjected to search at any time as a condition of parole. 547 U.S. 843, 857 (2006). In doing so, the Court stated that "parolees are on the continuum of state-imposed punishments," and the "acceptance of a clear and unambiguous search condition significantly diminished [the parolee's] reasonable expectation of privacy." *Id.* at 850, 852 (internal quotation marks and alterations omitted). Furthermore, the Court in *Samson* held that "because parolees are more likely to commit future criminal offenses, the State's interests are substantial and as was made clear in *Knights*, the Fourth Amendment does not render the states powerless to address these concerns effectively." *United States v. Tessier*, No. 3:13-00077, 2014 WL 4851688, at *4 (M.D. Tenn. Sept. 29, 2014) (quoting *Samson*, 547 U.S. at 854) (internal quotation marks, alterations, and emphasis in original omitted).

"Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848 (citations and internal quotation marks omitted). As held by the Sixth Circuit,

> The question here is one of reasonableness, as the warrant and probable cause requirements generally do not apply to searches of parolees, probationers or their residences. That means we must consider the degree to which the search intrudes upon an individual's privacy as well as the degree to which it is needed for the promotion of legitimate governmental interests. One factor central to this balancing inquiry is an individual's status on the privacy continuum. At one end of the continuum are free citizens, who enjoy absolute liberty. Probationers have fewer expectations of privacy than free citizens and parolees have still fewer expectations of privacy than probationers. At the other end of the spectrum are inmates, who have no legitimate expectation of privacy from searches of their prison cells.

*United States v. Smith*, 526 F.3d 306, 308-09 (6th Cir. 2008) (citations, internal quotation marks, and alterations omitted).

The Court in *Samson* specifically declined to analyze a parole search under a consent theory. 547 U.S. at 852 n.3. In *Smith*, the Sixth Circuit also expressly declined to rest its decision upholding a search pursuant to search conditions on a consent rationale, "explaining that the written condition was but one 'salient' factor in the 'totality of the circumstances pertaining to a parolee's status.'" 526 F.3d at 311 (quoting *Samson*, 547 U.S. at 852) (citing *Wilson v. Collins*, 517 F.3d 421, 426-27 (2008) (refusing to confine *Samson* to situations in which a suspicionless search is expressly authorized by a parole agreement)).[3]

**B. The Search**

A person who claims that his Fourth Amendment rights were violated by an unreasonable search must establish that he had a subjective expectation of privacy in the premises searched and that society would recognize his expectation as legitimate. *Carter*, 525 U.S. at 88. In

---

[3] The Fifth and Eleventh Circuits have taken an even broader view, finding no written condition or statute permitting such a search is even necessary. *See United States v. Keith*, 375 F.3d 346, 350 (5th Cir. 2004) (declining to require "either a written condition of probation or an explicit regulation permitting the search of a probationer's home on reasonable suspicion"); *United States v. Yuknavich*, 419 F.3d 1302, 1310-11 (11th Cir. 2005) (same).

other words, Defendant's "standing" to challenge the search of Cuff's home and the metal box hinges on whether he had a reasonable expectation of privacy in the item and place searched. Thus, the Court must first determine if Defendant met his burden to demonstrate he had a reasonable expectation of privacy in Cuff's home or the metal box.

A person who claims that his Fourth Amendment rights were violated by an unreasonable search must establish that he or she had a subjective expectation of privacy in the premises searched and that society would recognize his or her expectation as legitimate. *Carter*, 525 U.S. at 88. Defendant must first prove that by his conduct he has exhibited an actual expectation of privacy. *See King,* 227 F.3d at 743.

> The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents. [*United States v. Pollard*, 215 F.3d 643, 647-48 (6th Cir. 2000)] (holding that an occasional overnight guest who was permitted to be in the residence alone and who kept personal belongings in a closet in the living room had a reasonable expectation of privacy). In certain cases, this circuit has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence. *See United States v. Waller,* 426 F.3d 838, 844 (6th Cir. 2005) (holding that a transient person who was never an overnight guest had a reasonable expectation of privacy in a friend's apartment where he showered, changed clothes, and kept some personal possessions).

*Washington*, 573 F.3d at 283.

In determining whether an individual has a legitimate expectation of privacy, the courts look to the nature of the individual's ties to the property. *United States v. Harris*, 255 F.3d 288, 294-95 (6th Cir. 2001). "Although an overnight guest may possess a legitimate expectation of privacy in a residence being searched, a temporary visitor to a residence may claim no such protection." *Id.*

Cooke testified that Cuff said Defendant did not live with her but had been at her home for a few days/nights; nonetheless, he also testified that he could not recall exactly what Cuff said about how long Defendant had been at Cuff's home, as set forth in the following excerpts of Cooke's testimony:

> Q: And did you continue speaking with Ms. Cuff until your back-up arrived or –
>
> A: Yes. Me and Ms. Cuff just sort of -- she didn't want Mr. Gibson to hear, so she was being quiet and sort of glancing over at the door. She was telling me that he just got here a few days ago, just a little while ago, *I don't recall how long* and that she, that she just wants him gone.

[Doc. 24 at Page ID # 120] (emphasis added).

> Q: When you were talking with Ms. Cuff, did you have, did she give you any impression about whether he lived there or did not live there?
>
> A: She told me he didn't. He just showed up.

[Doc. 24 at Page ID # 154].

> Q: Did Ms. Cuff give you any indication about whether Mr. Gibson lived there or did not live there?
>
> A: He did not live there, said that he just got there a couple of days ago.

[Doc. 24 at Page ID # 155].

> Q: You indicated that Ms. Cuff told you Mr. Gibson had been there for a few days?
>
> A: A couple or a few days, something along those lines.
>
> Q: All right. And that would include nights, too. Right?
>
> A: Yes.

[Doc. 24 at Page ID # 157].

The recording of Cooke and Cuff's conversation disputes Cooke's recall. Cuff did not tell Cooke that Defendant was an overnight guest or had been at her house for a few days; rather the transcript reflects:

> Cook: what took place?
>
> Cuff: a little crazy . . he grabbed me, he didn't do, . . .it wasn't anything bad, but I kinda scared me 'cause we had situations before. So, uh, *he kinda showed up here, we're not even, we haven't been together for awhile*.
>
> Cook: is that his baby?
>
> Cuff: and, uh, *he just kinda showed up* and flipped out a little bit. I mean, nothing horrible happened like it did before but it just worried me, I couldn't let it get . . .

[Doc. 27 at Page ID # 201] (emphasis added). While talking to Goodrich later, Cuff said:

> Goodrich: so you think he had a gun.
>
> Cuff: the reason I said that was 'cause *he had not been with me, he had been gone for two months*, and I had heard . . . . somebody might have gotten shot while he was gone.

[Doc. 27 at Page ID # 204] (emphasis added). Cuff further said:

> Cuff: I really don't want to make a big deal of it. *He says he's gone* and that's all I want. So . . .

[Doc. 27 at Page ID # 201].

The testimony of Cooke during the hearing is equivocal and is further unsupported by the recording which merely demonstrates Cuff said Defendant was her "ex," that Defendant told Cuff he was "gone," [Doc. 27 at Page ID # 201] and that they had not been together for two months [Doc. 27 at Page ID # 201, 204]. This evidence does not indicate how long Defendant was at Cuff's home before the 911 call; at best, it indicates that he had left their relationship for about a two month period of time and then recently "showed up" again. How recently is

13

unknown as the evidence is contradictory at best. It is unknown whether Defendant showed up that day or a few days prior based on this evidence. Despite Cooke's uncertain testimony that Cuff said Defendant had been there for approximately two days, the recording indicates otherwise.

Although Defendant's argument assumes the proof shows he was an overnight guest of Cuff's for several days based on Cooke's testimony, that testimony—when viewed in the context of Cooke's admission that he could not recall exactly what Cuff said about how long Defendant had been at her house and the recorded version of that conversation—falls far short of proof by a preponderance of the evidence. While Defendant questions why the government did not call Cuff as an available witness, neither did he—and he has the burden to prove a reasonable expectation of privacy. The testimony of Cooke that he thought Cuff might have said Defendant had been there for a couple of days must be discounted by the fact that Cooke also said he could not remember exactly what Cuff said about how long Defendant had been there. The recording does not indicate Defendant was an overnight guest or had other meaningful connection to the residence.

It is the Defendant's burden to prove a meaningful connection to the property. *See United States v. Haynes*, 108 F. App'x 372, 375 (6th Cir. 2004) (finding the defendant had no legitimate expectation of privacy because he "failed to establish any meaningful connection to the property searched"); *United States v. Talley,* 275 F.3d 560, 563 (6th Cir. 2001) (finding the defendant presented no evidence that he had been to the residence for any period of time or for any purpose that would give rise to a legitimate expectation of privacy); *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986) (finding the defendant had no legitimate expectation of

privacy because his presence at the property was unexplained and the record disclosed no facts that entitled him to object to the search).

Based on the submitted proof, this situation appears to be more akin to a temporary or social visitor case rather than an overnight guest case. That Defendant had clothes in a trash bag in the living room of the house (that may or may not have been transported to the jail with him) and that some two months prior he had a relationship with Cuff does not prove a meaningful connection to the residence. Defendant had no items in the bedroom other than the metal box he apparently hid there. The general circumstances of Defendant's presence at Cuff's house weigh against his argument that he held an actual expectation of privacy based on a meaningful relationship to the premises. *See., e.g., Haynes*, 108 F. App'x at 375; *United States v. Plavcak*, 411 F.3d 655, 665 (6th Cir. 2005) ("It is well-settled that a person has no reasonable expectation of privacy where he is neither a resident nor an overnight guest in a residence"); *United States v. Ross,* 43 F. App'x 751, 757-58 (6th Cir. 2002) (finding no legitimate expectation of privacy where the defendant—who rented an apartment on a month-to-month basis—failed to pay rent for four months, abandoned the apartment for over two months without notifying his landlord that he was leaving or planned to return, and allowed the electricity to be shut off); *Talley*, 275 F.3d at 563 (holding that defendant lacked "standing" to challenge legality of officer's entry into apartment because he "presented no evidence that he had been in the apartment for any period of time or for any purpose that would give rise to his having a legitimate expectation of privacy in that apartment"); *McRae,* 156 F.3d at 711 (holding the defendant did not have a legitimate expectation of privacy in a vacant home in which he had lived for a week, but did not own or rent); *United States v. Hunyady*, 409 F.3d 297, 301-02 (6th Cir. 2005) (holding that a defendant who continued to live in a house owned by his dead father,

even after the representative of the estate had the locks changed, did not have standing to assert a violation of the Fourth Amendment just because he refused to acquiesce to the representative's lawful attempts to eject him); *United States Whitehead,* 415 F.3d 583, 588 (6th Cir. 2005) (defendant visitor did not have reasonable expectation of privacy in friend's residence when, despite having been frequent visitor for five months and having eaten meals with friend, he never stayed overnight and failed to present evidence such as repair bills or phone records linking him to residence); *United States v. Dix,* No. 94-4065, 1995 WL 351182, at *2 (6th Cir. June 9, 1995) ("We find that Dix does not have standing to object to the search of Butler's residence. As a casual, albeit frequent, visitor to his sister's apartment, who did not keep clothing there, who did not receive mail there, and who had no key, Dix had no reasonable expectation of privacy in the premises.").

Moreover, even assuming for the sake of argument that Defendant met the first part of the test that he had a subjective reasonable expectation of privacy in the metal box he hid in Cuff's house, I **FIND** he failed to prove he had an expectation of privacy that society is prepared to recognize as reasonable. Defendant left the metal box in a place which he had no legitimate control over. In this case, no evidence was presented that Defendant ever asked Cuff's permission to store belongings in her house or that Cuff would have granted such permission had he asked. Indeed, the recording indicates to the contrary—Defendant was "gone" without any indication he sought or would receive permission to store the metal box at Cuff's home.

Defendant presented no evidence to prove he could have legitimately harbored a reasonable belief that it was permissible for him to store the metal box at Cuff's house. Instead, this appears to be a circumstance in which, despite a possible subjective intent to retrieve a container later, Defendant took the risk that third parties, including authorities, might gain access

to its contents. *See United States v. Kellogg,* 202 F. App'x 96, 101 (6th Cir. 2006) (district court did not err in concluding that defendant lacked reasonable expectation of privacy in containers stored in third party's garage when it credited third party's testimony that defendant lacked his permission to store containers there; "If indeed Kellogg had White's permission to store his containers in the barn, then he may have had a reasonable expectation of privacy at stake in the search"); *United States v. McCarthy,* 77 F.3d 522, 535 (1st Cir. 1996) (defendant's argument that he harbored legitimate expectation of privacy in contents of suitcase was undercut not only by the fact that he left it unlocked and open in back room of third party's trailer but also by fact that he left it after the trailer's owner had told him to leave). Although Defendant may not have intended for Cuff to give the officers consent to look for or in the metal box, he gave Cuff the ability to do so by leaving it in her house without any proof he did so with her knowledge or permission.

Also weighing against Defendant's argument that he had a reasonable expectation of privacy that society is willing to accept is his status as a probationer subject to a warrantless search at any time by any officer. As a probationer, Defendant has fewer expectations of privacy than free citizens. *See Smith*, 526 F.3d at 308-09. *See also Samson*, 547 U.S. at 852 (holding that parolee who signed an order submitting to a search condition was "'unambiguously' aware of it") (quoting *Knights*, 534 U.S. at 119). Citing to *New v. Perry*, No. 2:07-cv-723, 2009 WL 483341, *9 (S.D. Ohio Feb. 25, 2009), which analyzed *California v. Sanders*, 73 P.3d 496, 505-06 (Cal. 2003), to conclude in a civil 42 U.S.C. § 1983 action that an order of probation does not justify a warrantless search where police were unaware of the probation order search condition at the time of the search, Defendant argues police cannot rely on the probation condition because it was not known at the time of the search. As reflected in

*Perry*, some courts have concluded that law enforcement officers cannot justify a search of a parolee's or probationer's person, property, or residence based solely on a probation or parole search condition of which they were unaware. 2009 WL 483341, *9. *Perry*, however, does not address how the expectation of privacy in the place or items searched might be impacted by such conditions under a totality-of-the-circumstances review. Neither party presented any such authority, nor have I located any such authority.

Although the police were unaware of Defendant's status as a probationer, a pertinent question is whether Defendant's status and his waiver of a warrant requirement impact his reasonable expectation of privacy. I **FIND** it is one additional circumstance to be viewed under the totality-of-the-circumstances standard. Under the totality of the circumstances in this case, I **FIND** Defendant has not met his burden to prove he exhibited an actual subjective expectation of privacy that society would find reasonable.

### C. Remaining Issues

As a result of finding that Defendant did not meet his burden to prove he had a reasonable expectation of privacy that society is willing to recognize as reasonable in Cuff's residence or in the metal box left in Cuff's house, he has no "standing" to challenge the search. As a result, it is not necessary to address whether the government met its burden to prove that Cuff gave valid consent to search the metal box or that the guns would have been discovered pursuant to Defendant's probation condition under the inevitable discovery doctrine.

Moreover, no evidence was presented regarding any post-arrest statement made by Defendant. Based on the parties' briefs, it appears to be undisputed that Defendant made a statement about the guns found in the metal box to someone at some time. Defendant is seeking to suppress his post-arrest statement about the guns on the sole basis that the search of

the metal box was unconstitutional. Because I **FIND** Defendant did not prove a legitimate expectation of privacy that society is willing to recognize as reasonable, it is not necessary to address whether the evidence acquired by the officers after, or as a result of, the search, namely Defendant's statement, should be suppressed as fruit of the poisonous tree. The tree itself (the search) is not poisonous, and thus neither is its alleged fruit (Defendant's statement).

### III. CONCLUSION

After having considered all evidence, testimony, and argument in this case, for the reasons stated above, I **RECOMMEND**[4] that Defendant's motion to suppress [Doc. 13] be **DENIED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).